PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-2712
_____

MATTIE HALLEY; SHEM ONDITI; LETICIA MALAVE;
TEMPORARY ADMINISTRATOR OF THE ESTATE OF
SERGIO DE LA CRUZ,
On Behalf of Themselves and All Others Similarly Situated

v.

HONEYWELL INTERNATIONAL, INC.;
PPG INDUSTRIES, INC.

Maureen Chandra,
                    Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 2-10-cv-03345)
District Judge: Honorable Esther Salas
_____

ARGUED: January 17, 2017

Before: AMBRO, VANASKIE, and SCIRICA,
*Circuit Judges*

(Filed: June 29, 2017)

Thomas Paciorkowski, Esq. [ARGUED]
P.O. Box 24182
Jersey City, NJ  07304

Rui O. Santos, Esq.
Shebell & Shebell
P.O. Box 2043
655 Shrewbury Avenue
Suite 314
Shrewsbury, NJ  07702

    *Counsel for Appellant*


Allan Kanner, Esq.
Elizabeth B. Petersen, Esq.
Kanner & Whiteley
701 Camp Street
New Orleans, LA  70130

Ned I. Miltenberg, Esq.
National Legal Scholars Law Firm
5410 Mohican Road
Suite 200
Bethesda, MD  20816

Anthony Z. Roisman, Esq. [ARGUED]
394 Skyline Drive
Weathersfield, VT  05156

   *Counsel for Appellees Mattie Halley, Shem Onditi,
   Leticia Malave, and Temporary Administrator of the
   Estate of Sergio De La Cruz*


Michael D. Daneker, Esq.
Allyson T. Himelfarb, Esq.
Arnold & Porter Kaye Scholer
601 Massachusetts Avenue NW
Washington, DC  20001

Michael R. McDonald, Esq.
Gibbons
One Gateway Center
Newark, NJ  07102

   *Counsel for Appellee Honeywell International Inc.*

_____

OPINION OF THE COURT
_____

**SCIRICA**, *Circuit Judge*.

   This is an appeal from the approval of a settlement of a Federal Rule of Civil Procedure 23(b)(3) class action arising out of hexavalent chromium contamination in Jersey City,

3

New Jersey. The class action was brought on behalf of property owners in several neighborhoods in Jersey City whose homes were allegedly contaminated by byproducts disposed of at two chromium chemical manufacturing plants. Defendants Honeywell International, Inc., and PPG Industries, Inc., are the successors in interest of the manufacturing plant owners and operators. Plaintiffs asserted common law tort claims and civil conspiracy claims for depreciation of their property values due to the alleged contamination, but not claims for harm other than economic loss to property value, such as personal injury or medical monitoring claims. The District Court certified a settlement-only class as to the claims against Honeywell[1] and approved a $10,017,000 settlement fund, which included an award of costs and attorneys' fees for plaintiffs' counsel. Maureen Chandra is a member of the Honeywell settlement class who objects to various aspects of the settlement and the award of costs and attorneys' fees.

We conclude the class certification requirements of Federal Rule of Civil Procedure 23(a) and (b)(3) are satisfied, and the District Court did not abuse its discretion in approving the settlement under Federal Rule of Civil Procedure 23(e) and the award of attorneys' fees under Federal Rule of Civil Procedure 23(h). But we will remand for the District Court to reconsider the award of costs under Rule 23(h).

---

[1] The settlement encompasses only the claims against Honeywell. Litigation of the claims against PPG is ongoing.

4

# I. BACKGROUND AND PROCEDURAL HISTORY

## A. Chromium Production in Jersey City

This case involves two chromate chemical production facilities in Jersey City, New Jersey. Honeywell is the successor in interest to Mutual Chemical Company of America, which operated a facility from 1895 to 1954 on West Side Avenue. PPG is the successor in interest to Pittsburgh Plate Glass Company and Natural Refining Company, which operated a facility from 1924 to 1963 on Garfield Avenue.

Both facilities created chromium ore processing residue ("COPR") as a byproduct of chemical manufacturing. COPR waste from the facilities was disposed of at two sites in Jersey City. Mutual disposed of COPR at a site near its plant on the west side of Jersey City, near the Hackensack River ("the Mutual site"). Pittsburgh Plate Glass disposed of COPR near its plant further east ("the Pittsburgh Plate Glass site"). Plaintiffs allege more than one million tons of waste products were disposed of at the two sites.

COPR contains hexavalent chromium,[2] which the United States Environmental Protection Agency and the New Jersey Department of Environmental Protection classify as a known human carcinogen. Hexavalent chromium is

---

[2] The element chromium exists in multiple stable oxidation states in nature. Trivalent chromium, or Cr(III), is the most stable and found in trace amounts in the human body. Hexavalent chromium, or Cr(VI), is unstable and causes potentially harmful reactions in human cells.

hazardous to humans and other organisms if inhaled or ingested in contaminated water.

Honeywell and its predecessors in interest have been proceeding with COPR cleanup at the Mutual site for many years. *See Interfaith Community Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248 (3d Cir. 2005). The State of New Jersey first sought a remedy for the site in 1982, after chromium waste was discovered in surface water on the site. *Id.* at 252. Over the course of ongoing negotiations with NJDEP, Honeywell and its predecessors attempted various interim remediation measures, including capping parts of the site with asphalt and a plastic liner. *Id.* at 253. There have been a number of consent orders regarding the Honeywell site arising from litigation brought by NJDEP under New Jersey environmental protection statutes and regulations in the New Jerseys state courts, beginning with a 1990 consent order, and most recently a 2011 consent judgment, as modified in 2013.[3]

In 1995, a community organization and its members brought a federal action against Honeywell and other defendants to compel cleanup of the Mutual site under the citizen suit provision of the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a)(1)(B). *Id.* at 252. The United States District Court for the District of New Jersey determined Honeywell was required to remediate under RCRA and directed Honeywell to excavate and remove chromium waste from the Mutual site under the supervision of a federal-court-appointed site administrator. *See id.* at 268

---

[3] The state consent judgments are made available by the New Jersey Department of Environmental Protection. http://www.nj.gov/dep/srp/siteinfo/chrome/

(affirming injunction against Honeywell to compel cleanup of Mutual site).

**B. Procedural History**

This action involves three putative classes of property owners in Jersey City in three different neighborhoods near the chromium manufacturing plants and related disposal sites. Class A includes property owners in a neighborhood east and south of the Mutual site. Class C includes property owners located in a smaller area west of Class A. Together, Class A and Class C include 3,497 properties. The neighborhood comprising Class B is in a different part of Jersey City, to the east of Class A and surrounding the Pittsburgh Plate Glass site to the north.

Plaintiffs allege both defendants negligently disposed of COPR and other chromium manufacturing byproducts, resulting in continuing contamination of the surrounding properties. They further allege Honeywell, PPG, and their predecessors, individually and in conspiracy with one another, concealed the fact of COPR disposal and the known health risks resulting from the disposal.

The Sixth Amended Complaint asserted five causes of action on behalf of the three putative classes: (1) private nuisance, (2) strict liability, (3) trespass, (4) negligence, and (5) civil conspiracy.[4] Plaintiffs sought compensatory relief in the form of economic damages "for loss of property value," as well as punitive damages.

---

[4] Plaintiffs also initially asserted claims for medical monitoring, which were withdrawn.

7

Plaintiffs initially filed this action in New Jersey state court in 2010, and defendants removed the case to the United States District Court for the District of New Jersey. On February 28, 2011, the District Court granted in part and denied in part Honeywell's motion to dismiss, and the case proceeded to discovery. On July 17, 2014, prior to the completion of discovery or filing of a motion for class certification, plaintiffs and Honeywell informed the District Court they had reached a settlement in principle following negotiations under the auspices of an independent third-party mediator.

On November 7, 2014, plaintiffs and Honeywell filed a motion for preliminary approval of the class action settlement. The District Court granted the motion on May 1, 2015, and certified two classes for settlement purposes, comprising Class A and Class C. The District Court also appointed class counsel and approved the proposed claims administrator and form of notice.

Following notice to the class, the District Court received three objections from four class members, and twenty-eight opt-out requests. Maureen Chandra was one of the objectors.

After the close of the objections period, on September 3, 2015, plaintiffs and Honeywell filed a motion for final approval of the class action settlement. Chandra filed a brief in opposition to the joint motion for settlement approval. On September 25, 2015, the District Court held a fairness hearing on the proposed settlement under Federal Rule of Civil Procedure 23(e)(2), at which Chandra made an appearance

through counsel. On April 26, 2016, the District Court, as outlined below, certified the class for settlement purposes under Rule 23(a) and (b), granted final approval of the settlement as fair and reasonable under Rule 23(e), and approved plaintiffs' counsel's motion for costs and attorneys' fees under Rule 23(h). *See Halley v. Honeywell Int'l, Inc.*, Civil Action No. 10-3345, 2016 WL 1682943 (D.N.J. April 26, 2016).

Chandra filed this appeal.[5] Chandra does not dispute the District Court's conclusions with respect to the requirements of Rule 23(a) and (b). But Chandra argues the District Court abused its discretion in finding the settlement fair and reasonable under Rule 23(e) and in awarding plaintiffs' counsel attorneys' fees and costs under Rule 23(h).

### C. Proposed Settlement

The settlement provides a $10,017,000.00 non-reversionary settlement fund for residential property owners in Class A and Class C to include payments to class members, incentive awards for class representatives, litigation costs, attorneys' fees, and fund administration expenses. The final breakdown of those payments is as follows:

| Total Fund | $10,017,000.00 |
|---|---|

---

[5] The District Court had jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there is minimal diversity between the plaintiffs and Honeywell; there are at least 100 class members; and the amount in controversy exceeds $5,000,000. We have jurisdiction over the District Court's final order approving the settlement under 28 U.S.C. § 1291.

9

| Incentive Awards | $20,000.00 |
|---|---|
| Litigation Costs | $1,140,023.77 |
| Attorneys' Fees | $2,504,250.00 |
| Fund Administration Expenses | $219,278.87 |
| Settlement Class Funds | $6,133,447.36 |

The two settlement classes include 3,497 properties, entitled to $1,745 per potential claimant. Valid claims were submitted on behalf of 2,085 properties, and the unclaimed funds will be distributed pro rata to valid claimants. Thus, the final allocation per property is $2,926.

## II. CLASS CERTIFICATION

To approve a class action settlement, a district court must determine the requirements for class certification of Federal Rule of Civil Procedure 23(a)[6] and (b)[7] are met. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619–20 (1997). The proposed settlement may be taken into

---

[6] The Rule 23(a) requirements are (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy. Fed. R. Civ. P. 23(a); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997).

[7] In addition to the Rule 23(a) requirements, which apply to all class actions, parties seeking class certification must also show the action is maintainable under Rule 23(b)(1), (2), or (3). Only Rule 23(b)(3) is at issue in this case, which imposes the additional requirements of (1) predominance and (2) superiority. *Amchem*, 521 U.S. at 615.

consideration when evaluating whether these requirements are met. *Id.*; *In re Prudential Ins. Co. America Sales Practice Litig. Agent Actions*, 148 F.3d 283, 308 (3d Cir. 1998). We review the District Court's decision to certify a class for settlement purposes for an abuse of discretion. *Prudential*, 148 F.3d at 299.

The District Court determined the proposed settlement classes should be certified after concluding the requirements of Rule 23(a) and (b) were met. With respect to Rule 23(a), the Court concluded joinder of the owners of the 3,497 properties in Classes A and C would be impractical. *See Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001). Second, the Court determined questions of fact relating to operation of the Mutual plant and subsequent remediation satisfied the commonality requirement. Third, the Court concluded the class representatives of Class A and Class B satisfied the typicality requirement through their contention that their respective properties have been adversely affected by COPR contamination resulting from Honeywell's conduct. Fourth, the Court determined class counsel was qualified to adequately represent the class, and the interests of the class representatives were adequately aligned with the other class members because they allegedly suffered the same harm through COPR contamination of their property and they seek the same remedy.

The District Court also found the requirements of Rule 23(b)(3) were met.

The predominance requirement was satisfied because common issues relating to the generation, disposal, and failure to remediate COPR, and Mutual and Honeywell's

11

knowledge of and negligence with respect to the effects of COPR disposal predominated over any individual issues. The Court determined the superiority requirement was met because the class action device achieved significant efficiencies compared to individual actions.

As noted, none of the objectors raised any issues with respect to Rule 23(a) and (b), and Chandra does not dispute these conclusions in this appeal. We conclude the District Court's findings were well within its sound discretion.

## III. FAIRNESS OF THE PROPOSED SETTLEMENT

Federal Rule of Civil Procedure 23(e) provides "the claims . . . of a certified class may be settled . . . only with the court's approval." "Even if it has satisfied the requirements for certification under Rule 23, a class action cannot be settled without the approval of the court and a determination that the proposed settlement is fair, reasonable and adequate." *Prudential*, 148 F.3d at 316 (quotation omitted). When the parties seek simultaneous class certification and settlement approval, courts must "be even more scrupulous than usual when they examine the fairness of the proposed settlement." *Id.* at 317 (quotation omitted). The ultimate decision whether to approve a proposed settlement under this standard "is left to the sound discretion of the district court." *Id.* at 299. "An appellate court may find an abuse of discretion where the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Id.* (quotations omitted).

We have articulated a number of factors to guide district courts in the exercise of their discretion to approve

class action settlements. In *Girsh v. Jepson*, we identified nine nonexclusive factors:

> (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

521 F.2d 153, 157 (3d Cir. 1975) (quotations and alterations omitted). In *Prudential*, we expanded the *Girsh* factors, to include, when appropriate, additional nonexclusive factors:

> [1] the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; [2] the existence and probable outcome of claims by other classes and subclasses; [3] the comparison between the results achieved by the settlement for individual

13

class or subclass members and the results achieved—or likely to be achieved—for other claimants; [4] whether class or subclass members are accorded the right to opt out of the settlement; [5] whether any provisions for attorneys' fees are reasonable; and [6] whether the procedure for processing individual claims under the settlement is fair and reasonable

148 F.3d at 323.[8]

## A. District Court Opinion

After careful consideration of each *Girsh* factor, the District Court determined the settlement was fair and adequate. Specifically, the Court concluded the first *Girsh* factor, the complexity, expense, and likely duration of litigation, weighed heavily in favor of settlement. The parties litigated a motion to dismiss followed by five years of discovery, but expert reports had not been exchanged, expert depositions had not been taken, and motions for class

---

[8] The American Law Institute has proposed streamlining and condensing these factors to better reflect the realities of modern aggregate litigation. *See* American Law Institute, *Principles of Aggregate Litigation* § 3.05 (2010). In August 2016, the Judicial Conference's Committee on Rules of Practice and Procedure published for notice and comment proposed amendments to the Rules of Civil Procedure. These amendments draw support from the ALI's recommendations in the *Principles of Aggregate Litigation* and incorporate, combine, and streamline many of the *Girsh* and *Prudential* factors into Rule 23 itself.

certification had not yet been filed. The claims at issue would involve complicated legal and technical issues at the summary judgment stage and at trial. Based on the extensive discovery that had already taken place, the District Court also concluded the third *Girsh* factor, the stage of proceedings and amount of discovery completed, also weighed in favor of settlement.

The District Court determined the second *Girsh* factor, the reaction of the class to the settlement, strongly weighed in favor of settlement. Claims were submitted for 2,089 of the 3,497 properties included in Classes A and C, representing almost 60% of the class. Only twenty-eight potential class members opted out of the settlement and three objections were filed. The Court concluded the "relatively minimal number of objections and opt-outs" weighed in favor of settlement.

With respect to the fourth and fifth *Girsh* factors, the risks of establishing liability and damages, the Court concluded there were litigation risks for both plaintiffs and defendants. First, the Court noted class certification had not yet been litigated and that there was some risk of failure for plaintiffs at that stage. Second, with respect to the merits, the Court explained there were substantial risks for both parties. In plaintiffs' favor, if liability were established, the alleged COPR contamination would result in significant diminution of property values and a large damages award. But defendants strongly contested liability.

In particular, the Court noted defendants' contention that none of the COPR disposed of at either site had actually migrated onto or otherwise contaminated the plaintiffs'

properties. The Court explained, "Honeywell contends that any fear or concern regarding the presence of chromium from the Mutual sites is not reasonable and is contradicted by other discovery obtained in the case; these and other issues, like causation and injury, present substantial obstacles for certifying a litigation class." Plaintiffs conducted no independent testing of class properties to determine if ground contamination existed due to COPR migration from the Mutual site, and Honeywell planned to offer expert testimony that no migration had occurred.

In addition, Honeywell took the position during litigation that the claims were time-barred given the long and well-publicized history of cleanup at the contaminated production sites. The applicable statute of limitations for claims of tortious injury to real property in New Jersey is six years. *See* N.J.S.A. 2A:14-1. The Court noted "Honeywell argues that considerable evidence of public awareness of the chromium issue in Jersey City may preclude plaintiffs' claims based on statute of limitations grounds." The litigation brought by NJDEP to force cleanup of the chromium manufacturing sites dated back to the 1980s, and was well publicized in Jersey City.

On balance, the District Court concluded there were serious questions as to liability and that a jury calculating damages would be presented with contrasting expert testimony. Because of the uncertainty with regard to class certification for litigation, and also with regard to liability and damages, the Court concluded the fourth and fifth *Girsh* factors weighed in favor of settlement.

The Court found the sixth *Girsh* factor, the risk of

maintaining the class action through trial, was neutral because there were no issues raised by any party that might have led to decertification. With respect to the seventh *Girsh* factor, defendant's ability to withstand a greater judgment, the Court concluded Honeywell would have been able to withstand a larger settlement, and this factor weighed against the settlement. But the Court concluded the seventh factor was of relatively little importance in context because the settlement achieved immediate and tangible benefit for the class.

In addition, the District Court considered and rejected a challenge to the scope of the release of claims. Chandra argued the eighth and ninth *Girsh* factors could not be properly evaluated because of the release of "unknown" and "unforeseen" claims. Rejecting this contention, the Court reasoned the release of future, unknown claims was a necessary part of the bargain to obtain the benefits of the settlement for the class. The Court noted the settlement did not prevent class members from seeking remediation of their properties in the future through the administrative procedures of the New Jersey Spill Act, N.J.S.A. § 58:10-23.11, which require an entity who discharges a hazardous substance to remediate the contamination regardless of fault.

Finally, the District Court determined the eighth and ninth *Girsh* factors, the range of reasonableness of the settlement in light of the best possible recovery and possible recovery in light of all of the attendant risks of litigation, weighed in favor of settlement. In so doing, the Court noted the settling parties had not identified a specific dollar amount for a best possible recovery. But the Court explained determining the best possible recovery, without completion of fact and expert discovery, would "risk either being exceedingly speculative—or exceedingly burdensome by

17

compelling litigation to continue . . . ." The Court concluded the information that was available, in the form of contrasting studies and proffered expert testimony, demonstrated conflicting valuations of the case. Without the ability to place a value on the best possible recovery, the Court's analysis of the eighth and ninth *Girsh* factors relied on its determination that the settlement "yields immediate and tangible benefits, and it is reasonable in light of the best possible recovery and the attendant risks of litigation—little or no recovery at all." *Halley*, 2016 WL 1682943, at \*15 (quoting *Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 240 (D.N.J. 2005). Ultimately, the District Court concluded the settlement was fair and reasonable under Rule 23(e) because the *Girsh* factors weighed in favor of approval of the settlement.

Chandra raises four issues with respect to the Court's approval of the settlement under Rule 23(e). First, Chandra argues the Court abused its discretion in approving the settlement without a record establishing the presence and extent of COPR contamination on class members' properties. Second, she contends the Court committed clear error in what she characterizes as the factual finding that class members could still seek remediation of their properties through administrative proceedings under the New Jersey Spill Act, N.J.S.A. 58:10-23.11 *et seq.* Third, she claims the Court abused its discretion because the settlement releases "unknown" and "unforeseen" future claims. Finally, she she asserts the Court abused its discretion in failing to consider the negative reaction of class members at a public meeting held by class counsel. After reviewing each of these arguments and for the reasons we explain, we conclude the District Court exercised sound discretion in approving the settlement under Rule 23(e) and will affirm the approval of

18

the settlement.

While the amount of the recovery for each class member appears troubling in light of the likely diminution of property values should liability be proved, five years of extensive fact discovery produced little evidence suggesting that liability could be established. This case involves only claims for diminution of property value due to COPR contamination, and personal injury or medical monitoring claims are not released in this settlement. Plaintiffs had conducted no testing to determine the extent, if any, of ground contamination of the class properties. Thus, the evidence of injury in the form of ground contamination was nonexistent or limited at best. The studies relied on by plaintiffs involved dust contamination in areas near the mutual site, but plaintiffs had limited evidence that the dust contamination was caused by COPR disposal at the Mutual site. Even if plaintiffs could establish injury and causation, the statute of limitations posed a formidable hurdle, given that the existence of COPR contamination at the Mutual site had been known for decades and the applicable statute of limitations was six years.

Plaintiffs likely realized it would be difficult to prove injury and causation and to surmount the statute of limitations. For its part, Honeywell, which continues to be responsible for cleanup and remediation at the Mutual site itself, was willing to pay $10 million dollars to avoid further litigation in this case. For these reasons, we agree with the District Court that the settlement "yields immediate and tangible benefits, and it is reasonable in light of the best possible recovery and the attendant risks of litigation—little or no recovery at all."

## B. Sufficiency of Record

Chandra argues the Court abused its discretion in approving the settlement without expert testimony regarding the presence and extent of COPR contamination on the properties in Class A and Class C. As noted, none of the experts retained by plaintiffs' counsel conducted tests of any class property for COPR contamination.

Chandra relies on our decision in *In re Pet Food Products Liability Litigation*. 629 F.3d 333 (3d Cir. 2010). In that case, we considered a proposed settlement of claims brought on behalf of a class of purchasers of tainted pet food. *Id.* at 336. The putative class was divided into several subclasses, including a subclass for purchasers of the tainted pet food who had not already received a refund from the retailers or manufacturers. *Id.* at 353. The settlement capped the total recovery for this purchaser subclass at $250,000. *Id.* But the settling parties produced no information to support their contention the $250,000 cap was sufficient to cover all of the possible claims in the purchaser subclass. *Id.* at 353–54. Because the parties did not supply information to explain how the $250,000 cap was calculated, the District Court was unable to conduct an analysis of the *Girsh* factors as applied to that subclass. *Id.* at 354. We reversed the approval of the settlement as to only the purchaser subclass and concluded "where funds available for some claims are capped while others are not[,] the settling parties should have provided the court with more detailed information about why they settled on the $250,000 cap." *Id.*

*Pet Food Products* also considered the District Court's analysis of the eighth and ninth *Girsh* factors—the range of

reasonableness of the settlement fund in light of the best possible recovery for the class and in light of the risks of litigation. *Id.* at 354–55. We explained "'in cases primarily seeking monetary relief,' district courts should compare 'the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing[,] . . . with the amount of the proposed settlement.'" *Id.* at 354 (quoting *In re General Motors Corp. Pick-Up Truck Tank Prods. Liability Litig.*, 55 F.3d 768, 806 (3d Cir. 1995) (quoting Manual for Complex Litigation (Second) § 30.44, at 252 (1985))). The settling parties did not provide estimations of the best possible recovery for the purchaser subclass, in particular "information identifying the amount of recalled pet food sold to consumers and the amount of refunds already paid to customers." *Id.* at 355. We explained this best recovery was relevant because it would have enabled the District Court to "make the required value comparisons and generate a range of reasonableness to determine the adequacy of the settlement amount." *Id.* (citing *Warfarin*, 391 F.3d at 538).

At issue in *Pet Food Products* was that the parties had not indicated to the District Court whether the information regarding the purchaser subclass existed. *Id.* We explained it might not be possible in every case to "reduce the final *Girsh* factors 'to a concrete formula.'" *Id.* at 355 n.30 (quoting *Prudential*, 148 F.3d at 322). We expressed no opinion, in the absence of a record, as to whether it would have been possible to calculate the best possible recovery for the purchaser subclass, and directed the District Court on remand to consider whether such a calculation would be possible based on additional information from the settling parties. *Id.*

This case is distinguishable from *Pet Food Products*. Here, the parties presented the Court with a number of studies relating to COPR contamination in Jersey City, which put forth conflicting views on the extent of contamination and migration. The District Court determined the information available was not sufficient to put a value on the claims, but also that determining the value of the claims would have required trying the merits of the case in the context of a settlement approval hearing. Based on the conflicting studies before it, the Court determined that it was possible to evaluate the reasonableness of the settlement in light of the possible recovery and litigation risks, and that the settlement provided substantial benefits for the class considering the risks.

The District Court did not abuse its discretion in approving the settlement without specifically identifying the best possible recovery for the class. As we have explained, "precise value determinations are not required" in evaluating a class action settlement. *Pet Food Products*, 629 F.3d at 355. The calculations required by the eighth and ninth *Girsh* factors—valuation of the best possible recovery and depreciation of that recovery for the risks of litigation—are fact-specific inquiries that must be tailored to the nature of the claims and the record developed in discovery. In some cases, like the consumer claims in *Pet Food Products*, it may be feasible to determine the aggregate value of the class's claims through the use of sales information as in that case or other readily available data. In other cases, litigation may have progressed through expert discovery, allowing the parties to present estimates based on expert testimony. *See Warfarin*, 391 F.3d at 538.

But in a case such as this, where valuation of

plaintiffs' claims is difficult or impossible without expert testimony, and expert reports have not been exchanged or depositions taken, the District Court need not delay approval of an otherwise fair and adequate settlement if it has sufficient other information to judge the fairness of the settlement. *Cf. General Motors*, 55 F.3d at 806 ("The evaluating court must . . . guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution."). District courts may approve settlements in which "calculating the best possible recovery for the class in the aggregate would be 'exceedingly speculative'" if the reasonableness of the settlement nevertheless can be "fairly judged." *Prudential*, 148 F.3d at 322. To conclude otherwise might risk requiring parties to continue to litigate cases unnecessarily after a fair settlement has been reached. In this case, we believe the District Court ably exercised its discretion in evaluating the eighth and ninth *Girsh* factors based on the record.

## C. Remediation through the Spill Act

In its analysis of the eighth and ninth *Girsh* factors, the District Court explained the release of claims in the settlement "does not require giving up [the] ability to obtain remediation all together . . . ." The settlement does not affect claims for remediation under the New Jersey Spill Act, N.J.S.A. § 58:10-23.11 *et seq.* The Spill Act authorizes the New Jersey Department of Environmental Protection to direct cleanup of hazardous waste spills and recover the costs of cleanups from the discharger. *See* N.J.S.A. § 58:10-

23.11f(a).[9]

Chandra argues the District Court's conclusion remediation was available through the Spill Act was a factual finding that represented clear error because in practice administrative proceedings under the Spill Act can take years to resolve. Chandra relies on the decision of the United States District Court for the District of New Jersey in earlier litigation against Honeywell relating to COPR cleanup in Jersey City. *See Interfaith Community Org. v. Honeywell Intern., Inc.*, 263 F. Supp. 2d 796 (D.N.J. 2003). In that case, the Court observed Honeywell delayed administrative proceedings under the Spill Act relating to the Mutual site. *Id.* at 826.

Chandra's reliance on this decision is misplaced. First, remediation remains available under the terms of the Spill Act, and homeowners may still seek remediation through NJDEP. Second, the District Court did not commit clear error or abuse its discretion when it concluded that Honeywell's actions more than fifteen years ago were not dispositive of the present case. For these reasons, it was not clear error or an abuse of discretion for the Court to consider the availability

---

[9] The Spill Act provides "[w]henever any hazardous substance is discharged," NJDEP "may, in its discretion, act to clean up and remove or arrange for the cleanup and removal of the discharge or may direct the discharger to clean up and remove, or arrange for the cleanup and removal of, the discharge." N.J.S.A. § 58:10-23.11f(a). The Spill Act authorizes NJDEP to identify "hazardous substances." *See* N.J.S.A. § 58:10-23.11(b). NJDEP identifies both chromium and "chromium compounds" in its environmental hazardous substance list.

of remediation under the Spill Act in evaluating the fairness of the settlement.

### D. Release of "Unknown" and "Unforeseen" Claims

Chandra argues the Court abused its discretion in approving the settlement because it releases "unknown" and "unforeseen" claims. She contends the release in the settlement is overbroad. In addition, Chandra objects to the release of claims relating to "in ground" contamination, as opposed to claims arising out of contamination by air-borne chromium dust.

It is not unusual for a class settlement to release all claims arising out of a transaction or occurrence. "[A] judgment pursuant to a class settlement can bar later claims based on the allegations underlying the claims in the settled class action." *In re Prudential Ins Co. of America Sales Practice Litig. (Prudential II)*, 261 F.3d 355, 366 (3d Cir. 2001). "[W]e have endorsed the rule because it serves the important policy interest of judicial economy by permitting parties to enter into comprehensive settlements that prevent relitigation of settled questions at the core of a class action." *Id.* (quotations omitted). Accordingly, the scope of the release is an important consideration in evaluating whether a settlement is fair and adequate under Rule 23(e). *See Pet Food Products*, 629 F.3d at 356.

In this case, the settlement releases

all claims stemming from any and all manner of actions, causes of action, suits, debts, judgments, rights, demands, damages,

compensation, injuries to business, loss of use and enjoyment of property, expenses, attorneys' fees, litigations costs, other costs, rights or claims of reimbursement of attorneys [sic] fees and claims of any kind or nature whatsoever arising out of the ownership of 1-4 family residential property in Settlement Class A area or Settlement Class C area including without limitation punitive damages, in either law or equity, under any theory of common law or under any federal, state, or local law, statute, regulation, ordinance, or executive order that the Class Member ever had or may have in the future, whether directly or indirectly, that arose from the beginning of time through the execution of this Agreement, WHETHER FORESEEN OR UNFORESEEN, OR WHETHER KNOWN OR UNKNOWN TO ALL OR ANY OF THE PARTIES, that arise out of the release, migration, or impacts of COPR, hexavalent chromium, or other chemical contamination (a) originating from the Mutual Facility at any time or (b) present on or migrating at or from Study Area 5, Study Area 6 South, Study Area 6 North, Study Area 7, or Site 119 at any time and into the future, including but not limited to property damage, remediation costs, business expenses, diminution of value to property, including stigma damages, loss of use and enjoyment of property, fear, anxiety, or emotional distress as a result of the alleged contamination. Released Claims include claims for civil conspiracy

26

asserted by the members of Settlement Classes A and C. Personal injury, bodily injury, and medical monitoring claims (if any) are not Released Claims.

As explained earlier, it is important to note that the release in this case affects only claims for economic loss due to diminution of property value, not personal injury or medical monitoring claims. The District Court carefully considered the scope of the release in relation to the claims asserted in its evaluation of the *Girsh* factors and concluded the settlement was a fair and adequate release of all COPR-contamination-related claims for diminution of property values, in light of the potential recovery and the litigation risk. Although plaintiffs did not test individual properties in the settlement class for chromium contamination, and the studies relied on by the District Court relate to airborne COPR dust contamination, as opposed to "in ground" contamination with COPR-containing fill, the District Court had a substantial record on issues relating to chromium contamination and the claims generally. The Court evaluated the litigation risks based on causation and statute of limitations issues applicable to all claims.

The thrust of Chandra's objection is the amount of evidence before the District Court when approving the settlement was insufficient. We have required the District Court have evidence on which to base its evaluation of the *Girsh* factors. *See Pet Food Products*, 629 F.3d at 350–51 ("[T]he court cannot substitute the parties' assurances or conclusory statements for its independent analysis of the settlement terms."). The determination of whether the record supports approval of the settlement and the release is a fact-

27

specific inquiry that is within the sound discretion of the District Court. *Id.* at 351.

We are satisfied the District Court did not abuse its discretion in approving the settlement that included the release of "unknown" and "unforeseen" claims and ground contamination claims. Presented with a record developed over five years of fact discovery, the District Court was in the best position in the first instance to evaluate the fairness of the settlement vis-à-vis the scope of the release. Moreover, the District Court's evaluation of the litigation risk was based on legal and factual issues common to all claims, specifically the lack of evidence of migration, causation issues, and the statute of limitations, regardless of factual differences between the different types of COPR contamination alleged. The District Court did not abuse its discretion in finding the scope of the release not overbroad given the substantial and immediate recovery for the class and the risks and costs of continued litigation.

### E. Class Reaction at July 22, 2015, Meeting

Chandra argues the District Court abused its discretion in evaluating the second *Girsh* factor—the reaction of the class to the settlement—by failing to consider the reaction of class members at a July 22, 2015, meeting with class counsel. No formal record of the July 22, 2015, meeting, which occurred prior to the close of the opt-out and objection period, was kept and no informal records of the meeting were entered in evidence at the fairness hearing.

In this case, the District Court rested its conclusion on the second *Girsh* factor on the very small number of

28

objections and opt-outs relative to the class and the large number of valid claims submitted. Only twenty-eight class members opted out, a rate of less than 1%, and just three class members filed objections.

A district court is not limited to formal objections and opt-outs in considering the reaction of the class under the second *Girsh* factor. *See General Motors*, 55 F.3d at 812–813. We have previously explained other evidence may be relevant to the analysis, including polling of the class. *Id.* And "vociferous" objections from a small minority of class members may overcome a presumption of acceptance by a silent majority. *Id.*

The settling parties point out that there is no evidence in the record to support the allegations made by Chandra about what occurred at the July 22, 2015, meeting. Assuming *arguendo* the allegations were supported by the record, they would nonetheless be outweighed by the other evidence of class reaction relied on by the District Court. The July 22, 2015, meeting occurred before the end of the objection and opt-out period. Thus, any negative reaction of the class at the meeting was not reflected in the formal objections and opt-outs. The informal reactions at the meeting in this case are insufficient to overcome the presumption created by the small number of objections and opt-outs, particularly because each class member received direct notice by mail and there is no reason to suspect class members were not aware of the objection process. For these reasons, the District Court did not abuse its discretion in concluding the second *Girsh* factor favored settlement notwithstanding the alleged events at the July 22, 2015, meeting.

## IV. ATTORNEYS' FEES AND COSTS

Federal Rule of Civil Procedure 23(h) provides "[i]n a certified class action, the court may award reasonable attorney's fees . . . that are authorized by law or by the parties' agreement." "A thorough judicial review of fee applications is required for all class action settlements." *Prudential*, 148 F.3d at 333 (quotations omitted). "The standards employed calculating attorneys' fees awards are legal questions subject to plenary review, but the amount of a fee award is within the district court's discretion so long as it employs correct standards and procedures and makes findings of fact not clearly erroneous." *In re Rite Aid Corp. Securities Litig.*, 396 F.3d 294, 299 (3d Cir. 2005) (quotations and alterations omitted).

Common fund cases, such as this case, are generally evaluated using a "percentage-of-recovery" approach, followed by a lodestar cross-check. *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 330 (3d Cir. 2011). The percentage-of-recovery approach compares the amount of attorneys' fees sought to the total size of the fund. *Id.* The lodestar method "multiplies the number of hours counsel worked on the case by a reasonable hourly billing rate for such services," and compares that amount to the attorneys' fees sought. *Id.* (quotation omitted). We have identified several factors to consider in determining whether attorneys' fees are reasonable under the percentage-of-recovery approach, including, *inter alia*, "(1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the

complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases," *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000), and "(8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations, (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained, and (10) any innovative terms of settlement." *In re Diet Drugs*, 582 F.3d 524, 541 (3d Cir. 2009) (citing *Prudential*, 148 F.3d at 338–40).

With respect to costs, Rule 23(h) authorizes recovery of "nontaxable costs that are authorized by law or by the parties' agreement" (emphasis added). Rule 23(h) does not expressly authorize an award of taxable costs, e.g., the costs enumerated in 42 U.S.C. § 1920. Such taxable costs "shall be allowed to the prevailing party" under Rule 54(d)(1). But we have previously concluded an attorney who creates a common fund through settlement of a class action under Rule 23 may recover all of the costs of litigation, including taxable costs. *See General Motors,* 55 F.3d at 820 n.39 ("The common fund doctrine provides that a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation . . . ."); *cf. Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 257 (1975) (explaining "the historic power of equity to permit . . . a party . . . recovering a fund for the benefit of others in addition to himself, to recover his costs, including his attorneys' fees, from the fund or property itself or directly

from the other parties enjoying the benefit.").

In the context of a common fund created by settlement of a class action under Rule 23, a district court may evaluate taxable and nontaxable costs together in the context of a petition for costs. While the authority for the award of each type of costs is different, Rule 23(h) for nontaxable costs and Rule 54(b) for taxable costs, each reduce the recovery of absent class members when deducted from the common fund and may be considered together by the court in reviewing a proposed settlement.

We review the District Court's decision to award costs for an abuse of discretion. *See In re AT&T Corp.*, 455 F.3d 160, 163–64 (3d Cir. 2006). An award of costs in a common fund case must be subject to the same "thorough judicial review" as an award of attorneys' fees, because costs, like fees, reduce the recovery of the absent class members. *See Prudential*, 148 F.3d at 333. As with attorneys' fees, "it is incumbent upon a district court to make its reasoning . . . clear, so that we, as a reviewing court, have a sufficient basis to review for abuse of discretion." *Gunter*, 223 F.3d at 196.

## A. District Court Opinion

Plaintiffs' counsel sought $2,504,250 in attorneys' fees, $1,140,023.77 in costs, $219,278.87 in claims administration expenses, and $20,000 in incentive awards for the two class representatives.

The District Court conducted a thorough percentage-of-recovery analysis applying the *Gunter* and *Prudential*

factors. The Court concluded each factor weighed in favor of approval of the award of attorneys' fees, and found, *inter alia*, that the $6,133,447.36 net recovery for the class, the complexity and duration of the litigation, the risks of nonpayment due to the liability and damages issues, and the time and skill devoted to the litigation favored approval of the fees. In addition, the Court found the $2,504,250 in fees, roughly 25% of the total fund, was reasonable in light of fee awards in other cases and what would have been negotiated as a contingent fee in the marketplace. The Court then conducted a lodestar crosscheck based on time records submitted by plaintiffs' counsel and determined the lodestar fee was $9,455,475.66, based on a blended billable rate of $342.11. The Court determined the requested fees of $2,504,250 was reasonable in light of this lodestar.

In addition, the Court approved the award of taxable and nontaxable costs,[10] based on an *in camera* review of

---

[10] Specifically, the costs included

> fees for experts or consultants in various scientific disciplines such as air transport of contaminants, risk assessment, forensic reconstruction, toxicology, property valuation and economics; mediation fees and costs; the costs associated with document management, reviews, imaging, copying, Bates labeling and productions; the costs associated with fact and legal research; forensic preservation of electronic files; court fees such as the filing of pleadings, subpoena service, and *pro hac vice* fees; discovery such as deposition transcripts

expense records submitted by plaintiffs' counsel. The Court concluded the costs were proper because they had been "adequately documented and reasonably and appropriately incurred in the prosecution of the case." *Halley*, 2016 WL 1682943, at \*27 (quoting *In re Cendant Corp., Derivative Action Litig.*, 232 F. Supp. 2d 327, 343 (D.N.J. 2002)).

Because the Court conducted a thorough evaluation of the petition for fees and costs and clearly set forth its reasoning in approving the awards, we will engage in detailed analysis of only the issues raised by appellant.[11] *See Sullivan*, 667 F.3d at 331. First, Chandra argues the District Court erred in analyzing the award of attorneys' fees based on the amount of the recovery before deducting costs, rather than after deducting costs, as required by New Jersey Court Rule 1:21-7. We agree Rule 1:21-7 applies, but conclude application of the rule had no effect on the District Court's substantive analysis, and thus the Court did not abuse its discretion.

Second, Chandra asserts the Court erred in not providing detailed information regarding the attorneys' fees and costs request to class members until after the objection

---

and videos; litigation support costs associated with copying, uploading, and analyzing voluminous data and document collections and costs associated with travel and lodging for hearings, client meetings, expert meetings, site visits, court conferences, co-counsel meetings, document reviews, mediation and meetings with opposing counsel.

[11] Chandra does not dispute the approval of incentive awards for the named plaintiffs.

period expired. Third, she claims the Court abused its discretion in awarding costs from the Honeywell settlement for costs incurred in litigation against PPG. With respect to attorneys' fees, we reject Chandra's arguments and will affirm. But we will remand for the District Court to reconsider the issue of commingled costs incurred in litigating claims against Honeywell and PPG.

### B. New Jersey Court Rule 1:21-7

The District Court granted attorneys' fees based on a percentage of the common fund before deducting costs. Alleging error, Chandra contends the Court was required to apply New Jersey Court Rule 1:21-7 and evaluate the award of attorneys' fees as a percentage of the fund after deducting costs.

Declining to apply Rule 1:21-7 in this case, the Court concluded, as a matter of federal procedural law, Federal Rule of Civil Procedure 23(h) supplanted the requirements of New Jersey Rule 1:21-7. The Court noted "courts in this Circuit seem to consistently award fees based on the gross recovery."

In the alternative, the District Court concluded application of Rule 1:21-7 did not change its evaluation of the attorneys' fees award as fair and reasonable. The Court found the fee award was roughly 25% of the total fund before deduction of costs, but only slightly more, 28% of the fund, after deduction of the costs. The District Court found 28% was also reasonable under the *Gunter* and *Prudential* factors.

New Jersey Court Rule 1:21-7 sets limits on contingent fee arrangements for lawyers practicing before

35

New Jersey courts. Rule 1:21-7(c) fixes the maximum amount of contingent fee that may be retained by an attorney based on the total size of the recovery. But Rule 1:21-7(f) provides an exception and allows the court, after written notice and a hearing, to determine "a reasonable fee in light of all the circumstances." At issue here, Rule 1:21-7(d) provides the permissible fee under the Rule "shall be computed on the net sum recovered after deducting disbursements in connection with the institution and prosecution of the claim, . . . including investigation expenses, expenses for expert or other testimony or evidence, the cost of briefs and transcripts on appeal, and any interest included in a judgment . . . ."

The United States District Court for the District of New Jersey incorporates Rule 1:21-7's limitations on contingent fees in its Local Rules. Civil Local Rule 101.1(c)(4) provides "[a] lawyer admitted *pro hac vice* is deemed to have agreed to take no fee in any tort case in excess of New Jersey Court Rule 1:21-7 governing contingent fees."

We have previously determined "contingency fee agreements in diversity cases are to be treated as matters of procedure governed by federal law." *Mitzel v. Westinghouse Elec. Corp.*, 72 F.3d 414, 417 (3d Cir. 1995). In *Mitzel*, the parties disputed whether New Jersey or Pennsylvania's limits on contingent fees applied in a diversity case brought by a Pennsylvania law firm on behalf of New Jersey clients in the United States District Court for the District of New Jersey. *Id.* at 415. The Local Rules for the District of New Jersey at that time incorporated the New Jersey contingent fee rule as federal procedural law through then-Local Rule 4(c), and the

District Court therefore applied New Jersey Rule 1:21-7's limitations on the maximum contingent fee. *Id.* We agreed and concluded the New Jersey contingency fee limits incorporated in the Local Rules applied as a matter of federal procedural law. *Id.*

We respectfully disagree with the District Court on the issue of Rule 1:21-7's application to this case. Lawyers practicing before the District Court are well aware contingent fee agreements will be subject to the limitations of Rule 1:21-7 as incorporated in the Local Rules. Accordingly, New Jersey Court Rule 1:21-7, incorporated in Civil Local Rule 101.1, acts as a federal procedural rule limiting contingent fee agreements in class actions certified under Federal Rule of Civil Procedure 23 in the District of New Jersey.

We see no reason why the analysis under Federal Rule of Civil Procedure 23(h) should supplant the limitations of Rule 1:21-7 because the rules are easily harmonized in this case. In evaluating the appropriateness of the class action settlement under Rule 23(h), the Court considered, in the alternative, the percentage of the recovery analysis based on the fund after deduction of costs. As the District Court correctly concluded, fees in this case are not limited to the percentages set forth in Rule 1:21-7(c) because Rule 1:21-7(f) applies and gave the court discretion to determine "a reasonable fee in light of all the circumstances." This reasonableness analysis was satisfied by the "thorough judicial review" we require of all fee awards in class action settlements under Rule 23(h). *See Prudential*, 148 F.3d at 333.

In this case, the District Court's analysis of the fee

award under Rule 23(h) is unaffected by the application of Rule 1:21-7. The Court expressly found in the alternative the fee award was reasonable as a percentage of recovery of the fund after deduction of costs. It did not abuse its discretion in approving fees that represented 28% of the fund after deduction of costs.

Chandra does not object to the 28% recovery on substantive grounds. Rather, she argues that because class counsel referenced the 25% figure in its Motion for Attorneys' Fees and Costs and the class notice, notice was defective under Rule 23. The class notice stated "Class Counsel will ask the Court for an award to cover costs and expenses, as well as for a fee award of $2,504,250, or 25% of the total amount recovered for the Classes." In addition, plaintiffs' counsel's Motion for Attorneys' Fees was posted on the class website, and also referenced the 25% of the total amount figure.

Rule 23(h)(1) requires notice of a motion for attorneys' fees and costs "directed to class members in a reasonable manner." In this case, notice of the motion for attorneys' fees was provided to the class at the same time as notice of the class action settlement. *See NFL Players*, 821 F.3d at 445 (noting Rule 23 contemplates "combining class notice of the fee petition with notice of the terms of the settlement" where practical). We have explained notice to the class "should contain sufficient information to enable class members to make informed decisions on whether they should take steps" to object to the settlement and fees motion. *NFL Players*, 821 F.3d at 446 (quotation omitted).

In this case, the class received notice of the critical

information—the amount of the attorneys' fees sought—even if the percentage stated in the class notice was slightly less than the percentage of the fund after deduction of costs. Rule 1:21-7 affects the District Court's Rule 23(h) analysis, but does not mandate any particular form of notice to class members under Rule 23(h)(1). The slightly different percentage of recovery stated in the notice to the class did not deprive the class members of the ability "to make informed decisions" on whether to opt out of the settlement or object to the fee award. *See NFL Players*, 821 F.3d at 446.

Because application of Rule 1:21-7 does not affect the District Court's analysis of the fee award and notice to the class was sufficient, we conclude the Court did not abuse its discretion in approving the fee award.

## C. Costs

Chandra argues notice to the class of costs was insufficient under Rule 23(h) because only the lump sum amount of costs sought was included in the notice to the class and details of the expenses were only provided to the District Court *in camera* after the objections period. The class notice did not include the amount of costs sought by plaintiffs' counsel. The notice explained "it is estimated that each eligible property would receive approximately $1,850 in payment" but "[t]he exact amount of any final payment to the property owners will depend on the Court's award of attorneys' fees and expenses, costs of administration, and the number of eligible members participating." The amount of costs sought was also included in class counsel's Motion for Attorneys' Fees and Expenses, which was posted on the class website. But the exhibits to that motion provided only limited additional details, in the form of general categories of costs

included in the award.

At the fairness hearing, class counsel provided additional details regarding the breakdown of costs. Specifically, class counsel stated

> [O]ut of the 1.1 million in costs that we have asked to be reimbursed, about [$]700,000 of that goes to experts . . . . About $83,000 went for the costs of depositions. That is just the transcripts, videos, just the nuts and bolts of the depositions. We got about $120,000 in costs related to document management, databases, things like that . . . . We have legal research which was over $30,000. We are going to have other incidental costs of phone and travel, of mediation costs.

Further documentation of the costs was then submitted to the District Court *in camera* but not provided to class members. The District Court approved $1,140,023.77 in costs for class counsel, which included $1,085,869.58 in costs incurred in pursuing claims against both Honeywell and PPG. The Court accepted class counsel's contention that all costs were advanced by class counsel "in their effort to prosecute the claims against Honeywell and PPG jointly."

In addition, class counsel averred they "reserve [the] right to seek reimbursement for such expenses should the Class B case against PPG resolve to the benefit of the plaintiffs." Class counsel suggested they "may perform a second distribution of expenses to the Class A and C plaintiffs based on a recovery from PPG."

Chandra's main objection to the award of costs is the inclusion of these expenses incurred in pursuing claims against both Honeywell and PPG. She contends the expenses, even if indistinguishable, should be apportioned equally between the Honeywell and PPG classes. To this end, Chandra argues that due process requires her to have the opportunity to review itemized expense records from class counsel.

We are not persuaded class counsel is required to provide itemized expense records to objectors or to the class generally to support the award of costs. But if an award of costs is approved after *in camera* review of attorney time or expense records, the District Court should provide sufficient reasoning so there is a basis to review for abuse of discretion. *See Gunter*, 223 F.3d at 196. The Court addressed Chandra's contentions regarding the expense award only in conclusory statements, and provided no reasoning explaining its decision to accept class counsel's contention that commingled expenses could not be separated or allocated proportionally between the two classes. In addition, class counsel made no formal commitment to repay the Honeywell classes proportionally for expenses should the PPG litigation prove successful. In this context, we will remand so the District Court may articulate why the costs were reasonably incurred in the prosecution of the case against Honeywell and to address the issue of commingled expenses, including, if appropriate, by requiring additional information from counsel or the parties.

## V. CONCLUSION

We will affirm the District Court's decision to certify the class for settlement purposes under Rule 23(a) and (b) and to approve the settlement as fair and adequate under Rule 23(e). We will also affirm the District Court's approval of the award of attorneys' fees under Rule 23(g). We will vacate and remand the District Court's approval of costs under Rule 23(g). In so doing, we express no opinion as to whether the costs should ultimately be approved and in what amount.